BSA 77 P STREET LLC, et al.,
Appellants/Cross–Appellees,

v.

Antwuan HAWKINS, et al.,
Appellees/Cross–
Appellants,

and

Sabrina Lymore, Appellee.

Nos. 07–CV–1080, 07–CV–
1101, 07–CV–1253.

District of Columbia Court of Appeals.

Argued Sept. 3, 2009.

Decided Nov. 19, 2009.

Robert E. Greenberg, with whom Thomas D. Murphy, Washington, DC, was on the brief, for appellants/cross-appellees.

William DeVinney, with whom Sean P. Beaty and Joseph M. Saka, Washington, DC, were on the brief, for appellees/cross-appellants.

Andrew J. Sloniewsky, Washington, DC, was on the brief, for appellee Sabrina Lymore.

Before REID and THOMPSON, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

This appeal results from a failed real estate transaction involving the attempted sale of low-income housing units owned by appellants/cross-appellees BSA 77 P Street LLC, et al. (BSA), a partnership entity. BSA attempted to enter into contracts with tenants Michele and Antwuan Hawkins, Lillian Johnson, Dorothy Paul, and Sabrina Lymore, to sell them their apartments in order to facilitate a sale of the remaining apartments BSA owned to a prospective buyer. We consider three issues on appeal: (1) whether the trial court erred in construing language in BSA's contract with its tenants as a condition instead of a promise, (2) whether the court erred in issuing a declaratory judgment that BSA's subsequent notice to its tenants to vacate their units violated D.C. housing law, and (3) whether the court erred in denying BSA's motion for costs and attorneys fees arising out of a fee-shifting provision in their contracts with the tenants. On the first two issues, we affirm the trial court's rulings. On the third issue, we remand for further consideration.

## FACTS

BSA owned thirty-seven rental units in thirty separate buildings in the District of Columbia that were collectively known as the Bates Street Properties. In 1982, after renovating the units, BSA entered into a twenty-year Housing Assistance Payment (HAP) agreement, covering all of the units, with the United States Department of Housing and Urban Development (HUD) whereby HUD subsidized housing for low-income tenants. To finance the purchase and renovation of the units, BSA borrowed $1.8 million, utilizing a Federal Housing Authority (FHA) insured blanket mortgage, from a private lender. Riggs Bank was the holder of the mortgage,

which was administered by Prudential Asset Resources (Prudential).

In 2001, as the HAP agreement was nearing its end, BSA sought a way to terminate ownership and management of the Bates Street Properties and exit the rental market. Following negotiations with Eagle Point Enterprises, LLC (Eagle Point), BSA signed a contract with Eagle Point on January 7, 2002, whereby Eagle Point would purchase the units and continue to operate them pursuant to the HAP agreement, which would be renewed in Eagle Point's name. The contract acknowledged that under the District of Columbia's Tenant Opportunity to Purchase Act, D.C.Code § 42–3404.01 *et seq.* (TOPA), BSA would first be required to offer its tenants the opportunity to purchase their individual units. Accordingly, at around the same time BSA entered the contract with Eagle Point, it issued notices to the Bates Street tenants informing them of their rights under TOPA.

Tenants Michele Hawkins, Antwuan Hawkins, Lillian Johnson, and Dorothy Paul responded to the notices and informed BSA that they intended to purchase their apartments. Several months later, on October 31, 2002, BSA and the tenants signed contracts for the purchase of their respective units with BSA. Appellee Sabrina Lymore signed a contract for the purchase of her unit with BSA on September 15, 2003.

The standard-form contracts presented by BSA to the tenants were substantially identical, and included an addendum containing the following language:

> Seller agrees to secure a partial mortgage release from the current mortgagee of the Property and, if necessary, the U.S. Department of Housing and Urban Development, in order to meet the requirements of Purchaser's lender, if any. Purchaser and Seller agree that the Sales Contract shall be voidable at the option of either Purchaser or Seller if, on the Settlement Date, the mortgagee has not agreed to release the mortgage which encumbers the Property.

The contracts also each contained the following provision regarding attorneys' fees: "In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court or arbitrator(s)."

The Hawkins, Johnson and Paul contracts specified a settlement date of December 16, 2002, while the Lymore contract scheduled the settlement date for November 11, 2003. Ultimately, however, BSA did not close with any of the tenants on the purchase of their units. Prior to the settlement dates and for several months thereafter, BSA negotiated with Eagle Point, HUD and Prudential to consummate the sale to Eagle Point and to obtain the release BSA deemed necessary to sell the properties to the tenants. The parties failed to close because, according to BSA, it did not receive the necessary release of the mortgage. BSA continued for some time thereafter its efforts to obtain the release and to conclude the sale to Eagle Point. The Eagle Point sale was not consummated because HUD refused to give Eagle Point a HAP agreement along the desired terms.

In September of 2003, Eagle Point terminated its contract with BSA for the purchase of units in the Bates Street Properties. BSA thereafter terminated its contracts with appellees Michele and Antwuan Hawkins, Johnson and Paul, returned their deposits, and in a September 30, 2003, letter explained that it had terminated the contracts because the required mortgage release had not been ap-

proved. BSA also withdrew its offer to Ms. Lymore, on the grounds that the release had not been forthcoming. The evidence presented at trial showed that, while Ms. Lymore signed her contract early in September, 2003, she did not send any notification of acceptance to BSA before she received, on October 9, 2003, notification from BSA that their offer was being revoked.

The Eagle Point sale having been unsuccessful, BSA pursued an alternate plan to transfer the units: to terminate the HAP agreement with HUD and sell the units, after renovation, for home ownership. By letters dated September 30 and October 8, 2003, BSA informed its tenants that it was terminating its HAP agreement and that they had one year under District of Columbia and federal law to obtain housing elsewhere. After BSA terminated its HAP contract, it refinanced its loan with a local Maryland bank, allowing BSA to pay off in full its earlier loan from Riggs Bank. When BSA prepared to sell the units to an alternate buyer, it again offered the tenants the opportunity to purchase their units. This time, several tenants other than appellees contracted to buy their units from BSA.

### PROCEDURAL BACKGROUND

On September 10, 2004, tenants Michele and Antwuan Hawkins, Lillian Johnson, and Dorothy Paul filed a civil complaint in the Superior Court of the District of Columbia, claiming that BSA breached its contract with them when it terminated their contracts, and asked the court to grant specific performance.[1] On January 5, 2005, BSA issued notices to the tenants to vacate their units under D.C.Code § 42–

3505.01(i)(1) and indicated that they intended to discontinue the tenants' use of the premises for rental housing in order to renovate the units and re-sell them for home ownership.[2] Indeed, on January 11, 2005, BSA signed a contract with TMS Investments, LLC (TMS) under which TMS agreed to purchase those units among the Bates Street Properties that were (or would then be) vacant on the date of closing, set for April 1, 2005. In response, the tenants filed an amended complaint on October 20, 2005, charging that the notices to vacate BSA issued were illegal under District law because they did not comply with D.C.Code § 42–3505.01(i).

After several days of trial on these claims, the court instructed the jury that it was to consider whether BSA's contracts with the tenants contained a condition and, if so, whether the condition occurred. The court further instructed the jury to determine (1) whether appellee Lymore "proved by a preponderance of the evidence that she accepted BSA's contract offer before the offer ended or BSA withdrew the offer," and (2) if the contract contained a condition that did not occur, whether the appellees proved by a preponderance of the evidence that BSA prevented or substantially prevented the condition—the failure to obtain the partial mortgage release—from occurring.

The jury found that Ms. Lymore did not accept BSA's offer before BSA withdrew it. The jury also found that the remaining tenants had not shown, by a preponderance of the evidence, that BSA prevented or substantially contributed to the failure to obtain the mortgage release. The trial court thereafter entered judgment for

---

1.  On February 11, 2005, Ms. Lymore filed a motion to intervene in appellees' action, which the trial court granted on March 24, 2005.

2.  Section 501(i)(1) of the Rental Housing Act of 1985 is codified as sub-section (i)(1) of D.C.Code § 42–3505.01.

BSA on the tenants' breach of contract claim. After a hearing, the trial court on August 28, 2007, entered a declaratory judgment that the notice to vacate BSA issued to the tenants on January 5, 2005, was not in accordance with law and was therefore void. The trial court also found that D.C.Code § 42–3505.01(i)—the statute under which BSA claimed authority to issue the notice to vacate—did not permit BSA to "resume any housing use of plaintiffs' units other than for rental housing." Accordingly, BSA's notice of eviction in which it disclosed its intention to evict the tenants, leave the property vacant for twelve months, renovate it, then sell it to owner-occupiers, was deemed invalid.

On September 7, 2007, BSA moved for costs and attorneys' fees from the tenants. BSA claimed it was the prevailing party in the litigation and was thus entitled to costs under Super. Ct. Civ. R. 54 and 54–I, and attorneys' fees under its contracts with appellees.[3] The tenants filed an opposition to BSA's motion. On November 5, 2007, the trial court denied BSA's motion for costs and fees without elaborate explanation. BSA filed its notice of appeal in the trial court on September 21, 2007, challenging the invalidation of its notice to vacate and the denial of costs and attorneys' fees. The tenants filed cross-appeals, challenging the result on the breach of contract claim.

### DISCUSSION

#### A.

Although the tenants in this case strenuously contend that BSA made an express promise to obtain a partial mortgage release for the sale of the properties and were obliged, in good faith, to effectuate that result, the trial judge concluded that obtaining a partial mortgage release was instead a condition upon which BSA's obligations under the contract depended. The court instructed the jury consistent with this approach. We find no error in this instruction.

Resolution of this issue involves general principles of contract interpretation. *See Generally* RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981). The proper interpretation of a contract term is a question of law, which this court reviews *de novo. See Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C.2008) (interpretation of the contract itself is a question of law for *de novo* review); *see also Psaromatis v. English Holdings I, L.L.C.*, 944 A.2d 472, 481 (D.C.2008) (when language of a contract is unambiguous, its interpretation is a question of law requiring *de novo* review). In interpreting a contract's terms, a court must determine "what a reasonable person in the position of the parties would have thought the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs.*, 485 A.2d 199, 205 (D.C.1984). Additionally, the contract "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.*

A condition is a fact, other than the passage of time, which is not certain to occur and which, unless excused, must occur before performance under the contract becomes due. *See Bergman v. Parker*, 216 A.2d 581, 583 (D.C.1966); RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981). A promise, by contrast, is an express or implied declaration that raises a duty to perform and subjects the promisor to liability

---

3. The jury found that BSA did not have a contract with Ms. Lymore. BSA nevertheless argued that she was liable for attorneys' fees: "because she took the position that she, in-

deed, had a contract, equity and fundamental fairness require that she be held to the same attorneys' fees provision as the other Plaintiffs."

for breach for failure to do so. *See Bergman,* 216 A.2d at 583; RESTATEMENT (SECOND) OF CONTRACTS § 2 (1981). The tenants remind us that there is a general presumption in favor of construing language in a contract as language of a promise rather than as language of a condition when that language is ambiguous. We find no such ambiguity here and therefore no need to resort to this presumption.

■ While the parties' choice of contract language does not lend itself easily to a formulaic approach, no particular form of words is necessary to create an express condition. *Washington Properties, Inc. v. Chin, Inc.,* 760 A.2d 546, 549 (D.C.2000). Additionally, words and phrases such as "if" or "provided that" qualifying a promise commonly indicate that the promise is expressly conditional on a specified event. *Id.* Here, the agreement by BSA to secure a partial mortgage release from the mortgagee was accompanied by the statement that "the Sales Contract shall be voidable at the option of either Purchaser or Seller *if,* on the Settlement Date, the mortgagee has not agreed to release the mortgage which encumbers the Property" (emphasis added). This is just the type of language the tenants argue is required for a statement of condition. It would appear that either party can avoid performance under the contract if a particular event, the mortgage release, does not occur.

This interpretation is further compelled by the fact that releasing the mortgage was an event outside the parties' control. In *Bergman,* a property owner who had contracted with an architectural firm for the construction of a building agreed to obtain the necessary permits to allow work to commence. Because obtaining the permits was entirely within the owner's control and the owner simply "decid[ed] to abandon the project" due to logistical difficulties, we found that the agreement to obtain the permits was a promise. 216 A.2d at 582. Here, obtaining the mortgage release was expressly contingent on Prudential's "agree[ment]" to release it, an assent that BSA could not independently obtain. BSA had no decision-making authority over Prudential or HUD. No matter how ardently BSA tried to effectuate the mortgage release, if these independent bodies would not allow it, the mortgage release would not be effectuated.

■ Notably, the record does not support a finding that BSA acted in bad faith. The jury found that BSA did not prevent or substantially contribute to the failure to obtain the mortgage release. Put another way, the jury found that the failure of the condition was not the result of any lapse on the part of BSA, but rather the result of Prudential's and HUD's refusals to release the mortgage. Based on the language of the contract at issue here, we cannot say the trial court erred in instructing the jury as to BSA's obligations with respect to the partial mortgage release.[4]

4. Despite appellees' contentions, our recent holding in *Psaromatis v. English Holdings I, L.L.C.,* 944 A.2d 472 (D.C.2008), is consistent with the trial court's finding here. In *Psaromatis,* the owner of an apartment complex (English Holdings) entered into an agreement with a buyer (Psaromatis) to sell him the complex. The agreement stated that Psaromatis' obligation to close was conditioned on English Holdings' conveying insurable title, and Psaromatis would be entitled to the return of his security deposit if English Holdings failed to convey such title. English Holdings was not able to deliver title free of claims because of a possible action by the building's tenants to exercise their TOPA rights. Psaromatis sued to obtain the return of his security deposit. Because obtaining insurable title was a condition precedent to Psaromatis' obligation to close, we found that his obligation under the contract was discharged and his security deposit should be returned. 944 A.2d at 485. Similarly, in this case, because obtaining a partial mortgage

## B.

We next turn to BSA's contention that the trial court erred when it found BSA's notice to vacate invalid pursuant to D.C.Code § 42–3505.01(i). BSA's plan, by its own admission, was to evict the tenants, hold the units vacant for the required twelve-month period, and then sell the units to owner-occupiers. The trial court found that this planned use would violate the statute. BSA argues its actions were entirely consistent with the statute and that the trial court's decision runs contrary to public policy because it effectively restricts a landlord's ability to remove himself from the rental housing business in the District of Columbia.

D.C.Code § 42–3505.01 governs evictions under the Rental Housing Act of 1985, § 42–3501 *et. seq.* The subsection in question, section 3505.01(i), governs situations in which a landlord may lawfully evict tenants to discontinue housing use of the property. The relevant statutory language reads:

> (i)(1) A housing provider may recover possession of a rental unit for the immediate purpose of discontinuing the housing use and occupancy of the rental unit so long as:
>
> (A) The housing provider serves on the tenant a 180–day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter;
>
> (B) The housing provider shall not cause the housing accommodation, of which the unit is a part, to be substantially rehabilitated for a continuous 12–month period beginning from the date

> that the use is discontinued under this section;
>
> (C) The housing provider shall not resume any housing or commercial use of the unit for a continuous 12–month period beginning from the date that the use is discontinued under this section;
>
> (D) The housing provider shall not resume any housing use of the unit other than rental housing.
>
> . . . .

D.C.Code § 42–3505.01(i)(1).

■ In interpreting a statute, we must look first to the language itself. *James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989). If that language is unambiguous, we must give effect to its plain meaning. *Id.* Here, the trial court found "the plain meaning to be that BSA shall not resume any housing use of [the tenants'] units other than for rental housing. As a result, the sale of [the tenants'] unit[s] by BSA would not comply with this provision of the statute." We find no error in this reasoning.

BSA argues that it, personally, would not be engaging in non-rental housing use of the property, but merely the subsequent owner-occupier would be. BSA argues that it would not be a "housing provider" within the definition of the statute because it would be selling the property, and that the new owner-occupier would not be a "housing provider" because it would not be receiving or entitled to receive rents. Thus, BSA seeks to avoid the plain meaning of the statute by using a third party to do what it was not allowed to do itself: use the property for non-rental housing. We have held in other settings that this cannot succeed. *See, e.g., Myco, Inc. v. Super Concrete Co., Inc.,* 565 A.2d 293, 301 (D.C.

release was a condition to BSA's obligation, BSA's obligation under the contract was dis-

charged when the contractual condition failed to occur.

1989) (preventing an independent contractor from receiving indemnity from an employer, where allowing indemnity would contravene statute protecting employer against non-workers' compensation liability by exposing the employer to liability to a third party sued by the employee).

BSA's proffered intention also runs contrary to the purpose of the statute. Section 3501.02, entitled "purposes," states that the Council sought, *inter alia*, "... (4) To protect the existing supply of rental housing from conversion to other uses; and (5) To prevent the erosion of moderately priced rental housing...." D.C.Code § 42–3501.02. The Council's purpose was to protect the diminishing supply of affordable rental housing in the District. To allow the result BSA seeks would be to fly in the face of that purpose. As in *Administrator of Veterans Affairs v. Valentine*, 490 A.2d 1165 (1985), we decline to construe terms like "housing provider" and "any housing use" narrowly to allow this landlord to achieve a result it deems commercially advantageous. 490 A.2d at 1169–70 (holding, "... in the context of [The Rental Housing Act], "landlord," "tenant" and "rental unit" are not to be understood solely according to the technical precepts of real property law. Rather, we think they must be interpreted by reference also to their more ordinary usage and the purposes of the statute.").

BSA's argument that the trial court's decision renders landlords incapable of escaping the rental housing business is without merit. As the trial court stated, the statute provides a basis for the relief sought. Section 42–3505.01 as a whole provides several ways in which a landlord may exit the rental housing market, and "it is the defendant [BSA] who has chosen to precede [sic] under this section [subsection (i)] for reasons only the defendant knows." A careful reading of the statute shows it to be not nearly as burdensome as BSA suggests. If in the future the legislature believes the statute to be unduly restrictive on the business opportunities of landlords, the legislature can change the law. Considering the present statute and its stated purpose, we can find no error in the trial court's ruling.

## C.

■ BSA sought legal fees and costs from all of the plaintiffs/appellees, including Sabrina Lymore, on the basis of the fee-shifting provision in their contracts with the tenants. That provision stated: "In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court or arbitrator(s)." The trial judge denied BSA's motion for an award of costs and attorneys' fees, without detailed reasons underlying his use of discretion. His order states, "The Court finds defendants [BSA] are not the prevailing party pursuant to D.C. Superior Court Rule of Civil Procedure 54." In addressing this issue, we are guided by the principle that the grant or denial of attorneys' fees is entrusted to the sound discretion of the trial judge. *See Maybin v. Stewart*, 885 A.2d 284, 288 (D.C.2005).

■ First, as regards appellee Sabrina Lymore, the jury found, and the judge found evidence to support, that she had no contract with BSA because her acceptance was not timely received. Given that she was not a party to any contract with BSA, we find no error in the court's denial of attorneys fees from Ms. Lymore based on any contractual provision. We affirm the court's ruling as it pertains to appellee Lymore.

■ As regards appellees Michele and Antwuan Hawkins, Lillian Johnson and Dorothy Paul, (the tenants), there was no similar finding that a contract never existed between these parties and BSA. Accordingly, we take a different tack. Given the trial judge's sparse explanation for his denial of attorneys' fees, and the nuanced nature of this case, we remand to the trial judge to consider the issue anew and provide a fuller explanation of what factors guide his exercise of discretion.

We observe that the "American Rule" of litigation contemplates that each party bear the costs and fees associated with bringing a case to court. *See, e.g., Peart v. District of Columbia Hous. Auth.,* 972 A.2d 810, 818 (D.C.2009). The American Rule places a priority on the ideal of public access to the courts without fear of being assessed monetary costs for unsuccessful advocacy. However, the "American Rule is subject to exception premised upon statutory authority, contractual agreement, or certain narrowly defined common law exceptions." *6921 Georgia Avenue, N.W., Ltd. Partnership v. Universal Cmty. Dev., LLC,* 954 A.2d 967, 971 (D.C.2008) (referencing *Synanon Found., Inc. v. Bernstein,* 517 A.2d 28, 35 (D.C.1986)). It is into one of these exceptions that BSA argues its claim fits, based on the fee-shifting provision in its contract. In the present circumstances, we direct that the trial judge consider these concepts and in his discretion, articulate a basis for the conclusions reached.

Thus we affirm in part, and remand for further consideration regarding attorneys fees.

*So ordered.*

THOMPSON, Associate Judge, concurring:

I write separately to address the issue discussed in section B of the court's opinion, relating to whether the trial court erred in finding that the notice to vacate that BSA gave tenants in reliance on D.C.Code § 42–3505.01(i) (2001) was invalid. Section 42–3505.01(i) permits a housing provider to "recover possession of a rental unit for the immediate purpose of discontinuing the housing use and occupancy of the rental unit" so long as specified conditions are met. One condition is that, in advance of recovering possession, the housing provider must serve on the tenant a 180–day notice to vacate. *Id.,* § 42–3505.01(i)(1)(A). There seems to be no dispute that BSA did that here. Another condition is that the housing provider must leave the rental unit idle for a continuous 12–month period after the housing use is discontinued; during that 12–month period, the unit may neither be renovated, nor used for housing, nor put to commercial use. *Id.,* §§ 42–3505.01(i)(1)(B)–(C). There seems to be no dispute that BSA complied with the 12–month restriction (except that appellees refused to vacate and remained in their rental units). In addition, section 42–3505.01(i)(1)(D) provides that "[t]he housing provider shall not resume any housing use of the unit other than rental housing." This is the provision with which appellees contend BSA failed to comply.

BSA's announced intent and the path that it pursued was to require tenants to vacate, leave the rental units idle for twelve months, and thereafter renovate the units and sell them for use as owner-occupied homes. That plan and course of conduct, appellees contend and the trial court found, sufficed to show that BSA did not actually plan to discontinue housing use of the rental units, but instead planned to resume a housing use other than rental housing. This court's opinion adopts a similar interpretation, concluding that "BSA seeks *to avoid the plain meaning of*

the statute by using a third party to do what it was not allowed to do itself: use the property for non-rental housing." Slip op. at 15 (italics added). The opinion also concludes that BSA's "proffered intention . . . runs contrary to the purpose of the statute," which is to "protect the existing supply of rental housing from conversion to other uses." D.C.Code § 42–3501.02 (2001).

BSA argues that while the statute places "restrictions on the nature of the 'housing use' a 'housing provider' may pursue in the future," the restrictions do not apply here because BSA itself would not be resuming any housing use of appellees' units; rather, once BSA sells the units, it would no longer be a housing provider and would not run afoul of the restriction that "[t]*he housing provider* shall not resume any housing use of the unit other than rental housing." D.C.Code § 42–3505.01(i)(1)(D) (italics added). BSA argues further that there is no indication that the D.C. Council intended to impose a "restraint on alienation" of property so draconian as to permit a landlord to exit the rental housing business and retire[1] only if the landlord already had in hand a third-party purchase contract that would permit the landlord to proceed instead under D.C.Code § 42–3505.01(e) (2001).

Ultimately, I agree with the majority that BSA did not satisfy the conditions of section 42–3505.01(i), but I am not comfortable arriving at that conclusion by looking merely at the statement of legislative purpose in section 42–3501.02 and at section 42–3505.01. Although the clear

purpose of the statute as declared in section 42–3501.02 is to protect the rental housing stock, in my view that does not assist us in interpreting section 42–3505.01(i)(1)(D), the task at hand. There seems to be no dispute that section 42–3505.01(i) would have permitted BSA to give tenants the required notice to vacate, leave the units unused for 12 months, and then sell them for non-housing, commercial use.[2] Since section 42–3505.01(i) permits erosion of the rental housing stock, in my view we do not arrive at a reliable answer to the question about whether the sales that BSA actually accomplished or contemplated were consistent with section 42–3505.01(i)(1)(D) by asking whether the end result is protection (instead of depletion) of the supply of rental housing.

Nor, in my view, does the "plain language" of section 42–3505.01(i) dictate that we interpret section 42–3505.01(i)(1)(D) ("*The housing provider* shall not resume any housing use of the unit other than rental housing") (italics added) to mean not only that BSA itself may not resume a housing use of the units other than rental housing, but also that BSA may not sell to at third party who intends to put the property to a housing use other than rental housing. That would be the plain meaning if, for example, section 42–3505.01(i)(1)(D) said that "no housing provider" (or, "no person") "shall resume any housing use of the unit other than rental housing." Such broad language is used in D.C.Code § 42–3505.01(d) (2001) (providing that "[a] natural person with a freehold interest in the rental unit may recover possession of a rental unit where the person seeks in good

---

[1]  Appellants' brief cites testimony that the managing member of BSA wanted to "leave the rental market, wind up the venture and retire." (Appellants' Brief at 7 n. 3.)

[2]  Moreover, as the court's opinion notes, when BSA eventually began selling the rental units, it offered them for sale to tenants under

the Tenant Opportunity to Purchase Act (*see* D.C.Code §§ 42–3401.01 to 42–3404.13 (2001)), another course that is permissible under section 42–3505.01 (specifically, section 42–3505.01(e)) and that likewise results in depletion of the rental housing stock.

faith to recover possession of the rental unit for the person's immediate and personal use and occupancy as a dwelling," and that *"[n]o housing provider* shall demand or receive rent for any rental unit which the housing provider has repossessed under this subsection during the 12–month period beginning on the date the housing provider recovered possession of the rental unit." (italics added)); and in D.C.Code § 42–3505.01(e) (providing that "[a] housing provider may recover possession of a rental unit where the housing provider has in good faith contracted in writing to sell the rental unit or the housing accommodation in which the unit is located for the immediate and personal use and occupancy by another person," and that *"[N]o person* shall demand or receive rent for any rental unit which has been repossessed under this subsection during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider." (italics added)). I make a similar observation about the contrast between the D.C. Council's use of language in section 42–3505.01(i)(1)(B) (*"The housing provider shall not cause* the housing accommodation, of which the unit is a part, *to be substantially rehabilitated* for a continuous 12–month period beginning from the date that the use is discontinued under this section") and the more direct language it used in section 42–3505.01(i)(1)(D) (*"The housing provider shall not resume* ...").* These provisions suggest that the Coun-cil—when it meant to do so—knew how to phrase the statute to assure that provisions that permit a landlord to withdraw a property from the rental market for specified reasons also bar *anyone else* from using the property in a manner that circumvents the protections the Council intended.[3]

However, what does persuade me that BSA's plan failed to comply with section 42–3505.01(i) is the language in a different section of the Rental Housing Act—specifically, D.C.Code § 42–3507.01 (2001).[4] Section 42–3507.01 provides that

No housing provider shall substantially rehabilitate, demolish, or discontinue any housing accommodation unless there has first been served upon each tenant residing in the housing accommodation a written notice of intent to rehabilitate, demolish, or discontinue the housing accommodation in accordance with § 42–3505.01(f), (g), (h), or (i), as appropriate. The notice shall advise the tenants of their right to relocation assistance under this chapter or any other District law, and the procedures for applying for the assistance. The Rental Housing Commission shall prescribe the content of the notice. No tenant may be evicted from a housing accommodation which the housing provider intends to substantially rehabilitate, demolish, or discontinue housing use, *or which the housing provider intends to sell to another person who, to the housing provider's*

---

**3.** *Cf. Tangoren v. Stephenson,* 977 A.2d 357, 360 n. 12 (D.C.2009) (applying the "usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended") (citing *Sosa v. Alvarez–Machain,* 542 U.S. 692, 711 n. 9, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)) (quoting 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:06 (6th rev. ed. 2000)).

**4.** Consideration of section 42–3507.01 as an aid to interpreting section 42–3505.01(i)(1)(D) is consistent with "the familiar maxim of statutory interpretation that counsels us to consider the statute as a whole, and, if possible, discern an interpretation that will harmonize and accord full force and effect to all of its provisions, without rendering any part meaningless." *In re Jacoby,* 945 A.2d 1193, 1198 (D.C.2008).

*knowledge, intends to substantially rehabilitate, demolish, or discontinue housing use,* unless the requirements of this section have been met. Nothing contained in this section shall be construed to limit a housing provider's right to evict a tenant for nonpayment of rent or violation of an obligation of the tenancy, if the action to evict is in compliance with § 42–3505.01.

D.C.Code § 42–3507.01 (italics added). This provision requires a housing provider who intends to sell a rental unit to another person who the housing provider knows intends to discontinue housing use of the unit to comply with the requirements of section 42–3505.01(i). In other words, section 42–3507.01 requires an interpretation that a housing provider discontinues housing use of a rental unit if the housing provider intends to sell the unit to another person who the housing provider knows will discontinue housing use. By logical extension, section 42–3507.01 can fairly be read to imply as well that a housing provider resumes housing use of a unit if the housing provider intends to sell the units to another person who the housing provider knows will resume housing use. Section 42–3507.01 thus supports an interpretation that if an intended purchaser of a rental unit that a housing provider withdraws from the rental market pursuant to section 42–3505.01 will put the former rental unit to a housing use other than rental housing, that action may be attributed to the housing provider, if the housing provider knows that this is the purchaser's intent. This precisely describes BSA's position, according to BSA's announced plans. Accordingly, having followed this somewhat tortuous path to its logical conclusion, I am comfortable agreeing with the majority that, in light of BSA's announced plans, it did not satisfy the requirements of D.C.Code § 42–3505.01(i)(1)(D).