*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0271

POTOMAC PLACE ASSOCIATES, LLC, APPELLANT,

v.

WALTER MENDEZ, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2019-LTB-022079)

(Hon. Maurice A. Ross, Trial Judge)

(Argued November 13, 2024                    Decided April 10, 2025)

*Joshua M. Greenberg*, with whom *Richard W. Luchs* and *Spencer B. Ritchie*, were on the brief, for appellant.

*Ramona Quillet* for appellee Walter Mendez.

Before BLACKBURNE-RIGSBY, *Chief Judge,* DEAHL, *Associate Judge*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*: This case involves appellant Potomac Place's efforts to evict appellee Walter Mendez from his home following the death of his mother. Potomac Place contends that Mr. Mendez's failure to respond to a notice to purchase his apartment or move issued pursuant to the Rental Housing Conversion and Sale Act (RHCSA), is grounds for eviction under the Rental Housing Act

(RHA). Mr. Mendez counters that he is protected from eviction because his mother, with whom he shared tenancy of his apartment at the time of the condominium conversion, was exempt from the requirements of the RHCSA and, therefore, the RHCSA and RHA provide no basis for terminating his tenancy. He further contends that his failure to comply with the notice to purchase or vacate does not provide Potomac with a basis for eviction because he is low-income and handicapped and thus exempt from participating in the RHCSA process. The Superior Court rejected Potomac Place's argument and granted summary judgment to Mr. Mendez. For the following reasons, we affirm.

## I.    Statement of Facts

On June 1st, 2003, Teresa Aparicio and her son Walter Mendez co-signed a lease to rent an apartment at 800 4th Street, SW, in Washington, D.C. Approximately two years later, the building's owner Potomac Place began the process of converting the building into a condominium. As required by the Rental Housing Conversion and Sale Act (RHCSA), Potomac Place held a conversion election in November 2005. A majority of 800 4th Street's eligible households voted for conversion, and by May 2006 the building was successfully registered as a condominium. In accordance with the RHCSA, Potomac Place sent most of 800 4th Street's tenants 120 Day Notices of Intent to Convert. D.C. Code § 42-3402.06.

These notices offered tenants the opportunity to purchase their apartment, but stated that, if tenants chose not to buy, they would be required to leave their residences so the residences could be sold. However, the RHCSA exempted certain households from its requirement that they purchase their unit or move. Specifically, at the time of 800 4th Street's conversion, apartment owners could not use the conversion process to evict households where the "head of household" was 62 or older and had an annual household income of less than $40,000 per year. D.C. Code § 42-3402.08 (2001) (amended 2006 and 2017). These households maintained a right to live in the building as renters. *Id.*

Because Ms. Aparicio qualified as a low-income elderly tenant her household was protected, and neither she nor Mr. Mendez received a Notice of Intent to Convert. The two continued to live as renters in the converted condominium without incident for the next thirteen years.

When Ms. Aparicio passed away in 2019 Mr. Mendez continued to live in the apartment. At the end of the lease term, Potomac Place sent him a Notice of Intent to Convert with the same choice it had offered his neighbors in 2006: he either had to purchase his apartment at the then-current market rate or move out. When Mr. Mendez refused, Potomac Place brought a complaint for possession in the Superior Court, arguing that, because the exempt status of the household was based on his

mother's age and income at the time of the 2005-2006 conversion, the exemption applied only during Ms. Aparicio's lifetime. Thus, because Mr. Mendez was not a low-income elderly tenant when the 2005 conversion election took place, he was now required to comply with the requirements of the RHCSA. Potomac Place asserted that it was irrelevant that Mr. Mendez *was* a low-income *disabled* tenant, or that the D.C. legislature had amended the RHCSA in late 2006 to also prohibit the eviction of low-income disabled households. Since these protections did not exist at the time of the conversion election, it stated, applying them to Mr. Mendez would be unlawfully retroactive.

Mr. Mendez filed a motion for summary judgment, arguing that since the conversion occurred in 2005-2006, the RHCSA no longer applied to him. Instead, he argued, his tenancy was governed by the provisions of the D.C. Rental Housing Act (RHA), which gave him a right to remain. The Superior Court agreed and granted Mr. Mendez's motion. Potomac Place timely appealed.

## II.    Standard of Review

Because this is a matter of statutory interpretation, it presents a question of law that we review de novo. *Aziken v. District of Columbia*, 194 A.3d 31, 34 (D.C. 2018). We also review a grant of summary judgment de novo, and will affirm if, even when viewed in the light most favorable to appellant, there is "no genuine

issue[] of material fact" and the appellee was "entitled to judgment as a matter of law." *Id.* (internal citations omitted); Super. Ct. Civ. R. 56(c).

### III. Analysis

### A.

This case turns on the statutory interpretation of and interplay between two D.C. statutes—the Rental Housing Act (RHA) and the Rental Housing Conversion and Sale Act (RHCSA). The RHA governs the relationships between landlord and tenants in the District of Columbia generally, while the RHCSA provides special rules for use during the conversion of rental housing into condominium regimes. *Adm'r of Veterans Affs. v. Valentine*, 490 A.2d 1165, 1168 (D.C. 1985); *Hornstein v. Barry*, 560 A.2d 530, 532-33 (D.C. 1989).

D.C. landlords attempting to evict a rent-paying residential tenant must comply with the dictates of the RHA. D.C. Code §§ 42-3501.01 *et seq.; cf. Hernandez v. Banks*, 84 A.3d 543, 553 (D.C. 2014) (the RHA provides an "expeditious statutory substitute for the ancient action of ejectment") (quoting *Thornhill v. Atl. Life Ins. Co.*, 70 F.2d 846, 846 (D.C. Cir. 1934)). Enacted in response to D.C.'s shrinking supply of rental housing in the 1970s and 80s, the RHA is part of a "comprehensive legislative scheme to protect the rights of tenants."

*Valentine*, 490 A.2d at 1168; *see also* Rental Housing Act of 1985, D.C. Council, Report on Bill 6-33 at 1-2 (March 22, 1985) (describing purpose and history of the RHA and its predecessors). It is an explicitly renter-friendly statute—its stated purposes include both "[t]o protect the existing supply of rental housing from conversion to other uses" and "[t]o prevent the erosion of moderately priced rental housing while providing housing providers and developers with a reasonable rate of return on their investments." § 42-3501.02(4)-(5). Its eviction protections, in particular, are designed to "eliminate improper attempts to remove low and moderate housing stock from the market." Rental Accommodations Act of 1975, D.C. Council, Report on Bill 1-33 at 36 (July 31, 1975). Therefore, we have asserted, the RHA "must be construed liberally" to protect the rights of tenants and achieve its desired goals. *Valentine*, 490 A.2d at 1168; *see also City Ctr. Real Est., LLC v. 1606 7th St. NW, LLC*, 263 A.3d 1036, 1044 (D.C. 2021).

Under the RHA, landlords are forbidden from removing rent-paying tenants unless the eviction falls into one of nine enumerated exceptions. D.C. Code § 42-3505.01; *see also Suggs v. Lakritz Adler Mgmt., LLC*, 933 A.2d 795, 798, 800 (D.C. 2007) (under RHA, "eviction [can] no longer be based on the landlord's unfettered right to terminate a lease in accordance with its terms"). The expiration of a lease is not one of these exceptions. *See Suggs*, 933 A.2d at 798. Nor is the death of a co-tenant or member of a household. *Cf. Odeniran v. Hanley Wood, LLC*,

985 A.2d 421, 427 (D.C. 2009) ("[T]he canon of *expressio unius est exclusio alterius* . . . embodies the common-sense principle that 'when a legislature makes express mention of one thing, the exclusion of others is implied.'") (citing *Council of District of Columbia v. Clay*, 683 A.2d 1385, 1390 (D.C. 1996)).

Potomac Place justifies its attempted eviction of Mr. Mendez solely via the exception listed under Section 42-3505.01(j) of the Rental Housing Act, which cross-references the Rental Housing and Conversion Sales Act.[1] Section (j) allows housing providers to "recover possession of a rental unit or housing accommodation to convert [it] to a condominium or cooperative," so long as notice to vacate is given "according to § 42-3402.06(c)." D.C. Code § 42-3505.01(j). In turn, § 42-3402.06(c), part of the RHCSA, states that "[a]n owner shall not serve a notice to vacate until at least 90 days after the tenant received notice of intention to convert[.]" Thus, read together, Section (j) allows landlords to "recover possession of a rental unit . . . to convert [it] to a condominium" so long as notice to vacate is served "at least 90 days after the tenant received notice of intention to convert"— and, presumably, so long as the other procedural strictures of the RHCSA are met.

---

[1] At oral argument, Potomac conceded that it alleged no other statutory basis for eviction.

"The primary rule of statutory construction is that the intent of the legislature is to be found in the language which it has used." *James Parreco & Son v. D.C. Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989). Thus, when interpreting a statute we look first and foremost to its plain meaning, and how its words would be ordinarily understood. *Id.; see also Hosp. Temps Corp. v. District of Columbia*, 926 A.2d 131, 136 (D.C. 2007); *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983). "If the plain meaning of statutory language is clear and unambiguous and will not produce an absurd result" contrary to legislative intent, "we will look no further." *Eaglin v. District of Columbia*, 123 A.3d 953, 956 (D.C. 2015) (internal brackets omitted) (quoting *Smith v. United States*, 68 A.3d 729, 735 (D.C. 2013)); *see also Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61, 65 (D.C. 1980) ("[T]he language being plain, and not leading to absurd or wholly impracticable consequences, it is the sole evidence of the ultimate legislative intent.") (quoting *Caminetti v. United States*, 242 U.S. 470, 490 (1917)).

Section 42-3505.01(j) states that notice to vacate is proper when a property owner "seeks . . . to convert" a rental unit or housing accommodation, as long as each tenant receives proper "notice of intention" to convert. Language such as "seeks to convert" and "notice of intent" is prospective, not retrospective. *See Declaration of Intent*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/declaration-of-intent;

https://perma.cc/QQ2P-JPXC ("an official document containing details of what a person, organization, or group hopes to do or achieve"); *Seek*, Merriam-Webster Dictionary; https://www.merriam-webster.com/dictionary/seek; https://perma.cc/NY8Q-M47L ("to try to acquire or gain: aim at . . . to make an attempt"). In this case, it clearly refers to a moment in time when action is being taken by a property owner to convert a rental unit or housing accommodation into a condominium or cooperative. However, it is undisputed that here the owners sought to—and, in fact, were successful—in converting the affected housing accommodation into a condominium nineteen years prior to their current efforts to evict Mr. Mendez. Thus, from a plain reading of the RHA, Potomac Place's reliance on Section (j) to justify Mr. Mendez's eviction appears to be misplaced.

Such an argument also does not appear to be supported by the legislative purpose underlying the Rental Housing Conversion and Sale Act. As we have noted:

> The [RHCSA] was passed in response to the housing crisis in the District of Columbia, during which many residents were left with no home after their rental units were converted to condominiums. These conversions had the greatest effect on . . . the elderly population who lived on fixed incomes . . . [and which was] "least able to purchase their unit once it converted and . . . least able to compete in a rental market which was rapidly increasing in price, while decreasing in available units."

*1618 Twenty-First St. Tenants' Ass'n. v. The Phillips Collection*, 829 A.2d 201, 203-04 (D.C. 2003) (internal brackets omitted) (quoting The Rental Housing and Conversion Act of 1980, D.C. Council, Report on Bill 3-222 at 2 (May 13, 1980)).[2] Thus, the RHCSA's statutory purpose is "[t]o discourage the displacement of tenants through conversion . . . and to strengthen the bargaining position of tenants . . . without unduly interfering with the rights of property owners to the due process of law[.]"  D.C. Code § 42-3401.02.  To support this purpose, the RHCSA imposes two principal safeguards: 1) a requirement that owners who wish to convert buildings must first gain the approval of a majority of tenants, and 2) even if conversion is approved, a bar on using the conversion process to evict specified exempt units.  D.C. Code §§ 42-3402.03, 3402.08.  As with the RHA, "the statute itself and the legislative history [of the RHCSA] leave no doubt about the paramount position of the tenant."  *Wilson Cts. Tenants Ass'n. v. 523-525 Mellon St., LLC*, 924 A.2d 289, 294 (D.C. 2007).  The text of the RHCSA even mandates that its provisions be interpreted "toward the end of strengthening the legal rights of tenants . . . to the maximum extent permissible under law."  D.C. Code § 42-3405.11.

---

[2] *1618 Twenty-First St. Tenant's Association* erroneously cites its source as a report on "Bill 3-22"; the correct number is Bill 3-222

Once those requirements are met, however, the only protection the RHCSA offers to low-income elderly (and in a subsequent amendment, low-income disabled) persons is the ability to continue to rent their units after conversion, subject to for-cause removal as specified by statute. D.C. Code § 42-3402.08. There is nothing in the RHCSA that exempts individual apartment units contained within a housing accommodation from the conversion should the requirements for conversion otherwise be met. *See infra* at 12 (discussing 1995 clarifying amendments to the RHCSA). The rental units themselves become part of a condominium regime under the RHCSA, and the conversion is completed. Yet the *occupants* of certain rental units are not required to make the purchase or move choice at the time of the conversion, and said occupants are protected by allowing them to remain indefinitely as tenants—subject, of course, to the for-cause exceptions of the RHA. § 42-3505.01. Such a reading harmonizes the two statutes and is consistent with the purposes underlying both Acts. *See District of Columbia Dep't of Consumer & Regul. Affs. v. A&A Rest. Grp.*, 232 A.3d 149, 154 (D.C. 2020) ("A statutory provision is to be read, whenever possible, in harmony with other provisions to which it naturally relates.") (internal brackets and quotation marks omitted) (quoting *In re L.H.*, 634 A.2d 1230, 1231 (D.C. 1993)); *see also Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (because "[i]t is a 'fundamental canon of statutory construction that the words of a statute . . . be read

in their context and with a view to their place in the overall statutory scheme[,]'" courts "must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme' and 'fit, if possible, all parts into an harmonious whole'") (internal citations omitted).

This interpretation also makes common sense, as the RHCSA lays out intricate procedures which must be followed to turn a housing accommodation into a condominium regime but offers no process to govern any "subsequent conversion" of individual units, further supporting Mr. Mendez's argument that once an accommodation has been converted, Section (j) is no longer available to a landowner as a means of eviction. Finally, this interpretation is supported by the Council's 1995 amendments to the RHCSA, wherein the Council clarified that a converted condominium which is subsequently re-rented out is still a condominium, and its owner "need not comply anew with [the RHCSA], even if the condominium units . . . have been occupied by tenants partially or exclusively." D.C. Code § 42-3402.02(4); *see also* Rental Housing Conversion and Sale of 1980 Reenactment and Amendment Act of 1995, D.C. Council, Report on Bill 11-53 at 8 (March 14, 1995). The Council made it clear that a housing accommodation is only

converted into a condominium once. After that, it remains a condominium indefinitely—even if some of its units are rented rather than owned.[3]

Thus, Potomac Place is barred from evicting Mr. Mendez under Section (j) of the RHA: not because Mr. Mendez is disabled and low-income, but because Section (j) is no longer applicable to 800 4th Street's residents, regardless of their disability or lack thereof.

---

[3] Nor is this "a case where the exclusion of an item from a list can be attributed to the drafters' understandable failure to anticipate (or reluctance to list) every far-flung hypothetical that could arise[.]" *Odeniran*, 985 A.2d at 427. The death or departure of an elderly renter is not a "far-flung hypothetical," and other states with similar tenant protections have statutes which explicitly address the consequences of a protected tenant's death. *See, e.g.,* Md. Code Ann. § 11-137(j) (extended tenancy for protected households "shall cease . . . 90 days after the death of the last surviving senior citizen or individual with a disability residing in the unit"); N.J. Stat. Ann. § 2A:18–61.32(a) ( "The administrative agency or officer shall terminate the protected tenancy status immediately upon finding that [] [t]he dwelling unit is no longer the principal residence of the senior citizen tenant or disabled tenant."); Mich. Comp. Laws § 559.204b(9) (extended lease "shall terminate automatically upon the death of the qualified senior citizen or qualified person with disabilities"). If the legislature wished to limit Mr. Mendez's protections to his mother's lifetime, it could have said so. Allowing the threat of purchase-or-vacate eviction to hang over households for years runs counter to not just the Act's text, but its legislative purposes, and its mandate that it be interpreted to favor tenants. *See Aziken*, 194 A.3d at 36 (rejecting proposed interpretation in part because "[t]he legislative history, even if it were necessary to resolve an ambiguity in the statutory language, [did] not support" the interpretation).

**B.**

Despite what appears to be a fair reading of the RHA and the RHCSA, Potomac Place argues that a literal interpretation of the RHA and RHCSA would lead to absurd results.[4] This argument is not persuasive.

We look beyond the plain meaning of a statute only when "reading [it] according to its ordinary meaning [would] produce absurd or inequitable results, or

---

[4] Potomac Place also maintains that, since the RHCSA at the time of the condominium conversion only protected elderly low-income tenants, applying the 2006 amendments to protect Mr. Mendez would be retroactive. However, as discussed *supra*, the potential retroactivity of the 2006 RHCSA amendments is irrelevant to our consideration of whether Section (j) (and thus the RHCSA) applies to Mr. Mendez's tenancy at this time. Because we hold that Section (j) is inapplicable to tenants post-conversion, it cannot be used to evict Mr. Mendez, even if the 2006 amendments never existed. And while Potomac Place cites *Redman v. Potomac Place Assocs., LLC*, 972 A.2d 316 (D.C. 2009), as support for its argument that allowing Mr. Mendez to remain after his mother's passing would amount to a retroactive application of the law, we are unpersuaded that the *Redman* case supports that argument in this case. Even assuming we agreed with appellant that Section (j) could be used to evict tenants who were part of protected households at the time of the condominium conversion, we fail to see how the holding in that case would be applicable here. Ms. Redman, a low-income disabled tenant who also lived at 800 4th Street during the building's conversion, argued she was protected from eviction by the 2006 amendments to the RHCSA. *Id.* at 317. Our court noted that at the time the RHCSA amendments passed in November 2006, Ms. Redman was no longer a lawful tenant because, unlike Mr. Mendez, she had received legally valid notice to vacate by September 2006 and had refused to do so. *Id.* at 319-20. Thus, "her right to continue possession of the unit" had ended, and she could not claim eviction protections the legislature had reserved for lawful tenants. *Id.* at 320-21. We held that because, when the amendments passed, she "was not then a 'tenant' subject to the prohibition on eviction. . . . the [RHCSA] did not prevent Potomac from seeking and obtaining possession of her unit." *Id.* at 321.

undermine the purposes or policies" of the legislation. *Peoples Drug Stores*, 470 A.2d at 755. Potomac Place argues that is the case here and attempts to paint a future in which households protect themselves from eviction in perpetuity; in this scenario, as soon as one tenant dies, there is always another tenant to take his place. Since the apartment is never empty, it can never be sold to a condominium buyer, and landlords who wish to leave the rental business have to deal with the burden of tenants forever—an action which, in addition to being an absurd result, would have a severe chilling effect on future condominium conversions.

In reality, however, the RHA and RHCSA "as a whole provide[] several ways in which a landlord may exit the rental housing market." *BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 996 (D.C. 2009). Like any D.C. landlord, Potomac Place can evict Mr. Mendez if he fails to pay rent or violates any other "obligation of tenancy" under § 42-3505.01. D.C. Code § 42-3505.01; *see also Suggs*, 933 A.2d at

---

By contrast, Mr. Mendez was a lawful tenant when the 2006 amendments were passed—he had received no notice to vacate, and would not receive one until over a decade later. His situation is entirely distinct from the scenario in *Redman*. Moreover, even if we agreed that Section (j) allows for the eviction of tenants years after conversion, it is still doubtful whether applying the 2006 amendments to Mr. Mendez would be retroactive. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Lane v. Dep't of Hous. & Cmty. Dev.*, 320 A.3d 1044, 1047 (D.C. 2024) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). The eviction protections D.C. created in 2006 may very well have upset Potomac Place's 2005 plan for its condos. That does not mean these protections are not applicable to an eviction initiated in 2019.

798. Potomac Place can also attempt to persuade him to leave his home by buying him out and/or helping him find an acceptable substitute apartment in a different building. And, to the extent that Potomac Place is arguing that new tenants could be added to the current lease to prolong the tenancy unreasonably, it has provided no reason why it could not refuse to add new tenants to Mr. Mendez's lease, or make new tenants sign a lease acknowledging they can be evicted to sell the unit (an action the RHCSA appears to have endorsed in its 1995 amendments, when it provided that re-rented condominium units can be sold without following the RHCSA if tenants are given an opportunity to purchase and are put on notice or waive their rights before occupancy.) D.C. Code § 42-3402.02(a)(4); *see also* Rental Housing Conversion and Sale of 1980 Reenactment and Amendment Act of 1995, D.C. Council, Report on Bill 11-53 at 8 (March 14, 1995).

At heart, Potomac Place's arguments about a chilling effect are issues of legislative policy, not judicial interpretation. *Aziken*, 194 A.3d at 36. It may be true that our interpretation will deter some landlords who would have otherwise converted their buildings into condominiums or cooperatives from converting them. (Given that one of the RHCSA's purposes is to "discourage the displacement of tenants through conversion or sale of rental property," that may even have been one of the legislature's goals.) D.C. Code § 42-3401.02. Yet "[i]f in the future the legislature believes the statute to be unduly restrictive on the business opportunities

of landlords, the legislature can change the law." *BSA 77 P Street*, 983 A.2d at 996. In the end, "we cannot say that the consequences of a literal reading of the statute are so absurd or unjust that we may rewrite it to achieve a result which some might deem more equitable." *Parrecco*, 567 A.2d at 48; *see also Edgewater Inv. Assocs. v. Borough of Edgewater*, 510 A.2d 1178, 1183 (N.J. 1986) ("Ultimately, appellant urges that the Legislature could have enacted a scheme that more precisely effectuated its desired ends. But the legislative approach need be only rational, not perfect.").

## IV.    Conclusion

The Rental Housing Act protects most rent-paying D.C. tenants from eviction. When Potomac Place converted 800 4th Street into a condominium, these protections were temporarily lifted for certain residents. Thus, Potomac Place was allowed to evict them if they chose not to purchase their units as part of a condominium conversion that eligible tenants had voted to allow under Section 42-3505.01(j). Yet this window of opportunity ended when the conversion was completed in 2006, and those tenants who were prevented from voting on the question of the conversion were similarly protected from the consequences of the conversion and allowed to maintain their status as tenants, subject to the mandates

of the RHA.[5]   Therefore, Mr. Mendez cannot now be removed on the basis of Section 42-3505.01(j).   Since Potomac Place offers no other grounds for Mr. Mendez' eviction, we affirm the decision of the Superior Court.[6]

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

---

[5] We note that the RHCSA may grant additional protections to low-income elderly and disabled tenants by limiting the grounds for their post-conversion eviction.   The RHCSA states that the "owner of a rental unit in a housing accommodation converted under [the RHCSA]" cannot evict a low-income elderly or disabled tenant unless the tenant violates an obligation of tenancy, performs an illegal act within the unit, fails to pay rent, or (since 2006) waives her right to remain in order to participate in the conversion election.  D.C. Code § 42-3402.08.   By contrast, while the RHA lists non-payment of rent, performance of an illegal act, and violation of an obligation of tenancy as grounds for eviction, it includes other grounds for eviction as well (such as recovering possession to make alterations or renovations, or for personal occupancy).  Thus, while Section (j) ceases to apply to any tenant once conversion is completed, there may be some limited scenarios where an alternate RHA provision which applies to a non-disabled, non-elderly, post-conversion tenant would not apply to an elderly or disabled one.  Since this scenario is not before us, we decline to resolve it here.

[6] In his briefs and at oral argument, Mr. Mendez additionally argued that he could not be evicted because, as Ms. Aparicio's joint and several co-tenant, he inherited her statutory tenancy protections upon her death.  This argument is overly expansive, and is not the basis for our holding.  Mr. Mendez is not protected because he was a joint and several tenant.  He is protected because, at the time of the conversion, he was a bona fide tenant who could not be evicted under the law.